138

In the Matter of TRANS WORLD AIRLINES, INC., Petitioner, v. STATE HUMAN RIGHTS APPEAL BOARD et al., Respondents.

Second Department, December 2, 1974.

*Poletti Freidin Prashker Feldman & Gartner (Peyton H. Moss* and *Eric D. Witkin* of counsel), for petitioner.

*Pierre M. Michel,* respondent *pro se.*

*Henry Spitz* for State Division of Human Rights.

SHAPIRO, Acting P. J. The State Division of Human Rights, by an order dated June 22, 1973, found no probable cause to believe that the petitioner, Trans World Airlines, Inc. (TWA), had discriminated against a certain complainant, Pierre M. Michel, its employee, by reason of his sex. The State Human Rights Appeal Board, by order dated February 27, 1974, reversed that determination and remanded the matter to the division for further proceedings. TWA now brings this proceeding pursuant to the provisions of section 298 of the Executive Law to review the latter determination.* We annul the appeal board's order and reinstate the order of the division, on the law.

THE ISSUE

The major and determinative issue raised by this proceeding is whether the adverse effects suffered by the complainant as a result of a change in the seniority provisions made by a 1970 collective bargaining agreement between TWA and the trade union representing all of TWA's flight cabin service employees (all designated as cabin attendants), namely, respondent Air Line Stewards and Stewardesses Association, Local 550, Transport Workers Union of America, AFL-CIO (the Union), involved discrimination in employment based on sex by TWA, the employer, in violation of the statutory ban on such discrimination contained in section 296 of the Executive Law. By the change in question persons moving from one category to another of cabin attendants are allowed to carry with them their seniority acquired in the former category. Subdivision 1 of section 296, as it read at the times here in question, provided in relevant part: " 1. It shall be an unlawful discriminatory

---

* The major respondent to the petition was, of course, the State Human Rights Appeal Board, which had issued the order which the petitioner, TWA, seeks to have reviewed. But by letter dated April 24, 1974 the General Counsel of the Division of Human Rights informed this court that because "it is the present policy of the Commissioner of this Division that when an order of the Division is vacated by the State Human Rights Appeal Board the Office of General Counsel should not play an active role against the Appeal Board in the courts." As a result, neither the Appeal Board nor the Division has submitted a brief in this court in connection with this proceeding. Only the complainant, Michel, submitted a brief as a respondent *in propria persona,* in opposition to that of the petitioner.

'practice: (a) For an employer, because of the age, race, creed, color, national origin or sex of any individual  *  *  *  to discriminate against such individual in compensation or in terms, conditions or privileges of employment.''

## TWA'S EMPLOYMENT PRACTICES

On or before April 29, 1968, TWA had two classes of cabin flight attendants. One class, consisting of hostesses, *a position which was limited to females*, was used on both domestic and international TWA flights. A second class, flight pursers, *a position limited to males*, was used only on international flights.

The basic duties of hostesses are set forth in subdivision (A) of article 2 of the 1970 Union contract governing flight attendants as follows: " ' Hostess ' means an employee whose work shall include performing and assisting in the performance of all enroute cabin services and ground service to delayed or cancelled passengers in a resourceful and gracious manner, and the responsbility to apply these services for the welfare, comfort, enjoyment and safety of passengers ''.

Subdivision (C) of article 2 defines the duties of flight pursers, in the main, as follows: " ' Flight Purser ' means an employee who provides or assists in providing service to passengers while in flight, and whose work includes performing and assisting in performing all enroute cabin service, attending to passenger comfort, responsibility for the preparation and completion of passenger, crew, and cargo manifests enroute, and other reports as required by the Company or by law. When two (2) or more cabin attendants are assigned to an international flight on which international cabin attendants under this agreement are utilized, at least one (1) of these shall be a Flight Purser who will be designated as being in charge of cabin service.''

TWA employed about 3,500 hostesses and only a few hundred flight pursers. The latter received a higher salary and were required to be fluent in at least one European language and proficient in a second. There were no foreign language requirements for hostesses.

In August, 1967 a collective bargaining agreement was entered into between TWA and the Union under which the past pattern of sex discrimination with respect to both the hostess and flight purser positions was modified to eliminate the limitation of purser's jobs to males. The previously existing pattern may even then (1967) have been in violation of both the Civil Rights Act of 1964 (U. S. Code, tit. 42, § 2000e–2, Pub. L, 88–352,

tit. VII, 1964) and section 296 of the Executive Law (art. 15, Human Rights Law) as amended in 1965 (L. 1965, ch. 516, § 1, eff. Sept. 1, 1965). Both barred discrimination in employment because of sex. Since that pattern denied eligibility to positions as hostesses to males and to positions as flight pursers to females, it was on its face discriminatory.

The change made in 1967 undid some of the existing sex discrimination, because the collective bargaining agreement made in that year allowed qualified hostesses to become flight pursers and to bid for future purser vacancies. Only about 13 hostesses qualified to become flight pursers. But under the then existing seniority system, which barred hostesses who had become flight pursers from carrying over to their new positions the seniority they had earned as hostesses, the new female flight pursers, as the last hired as such, were the first ones subject to furlough when flight pursers were laid off during a slack season. Where such layoffs were so extensive as to affect some of the male flight pursers, despite their seniority over their newly elevated hostess confreres, they discovered that they were victims of the continuance of the pattern of sex discrimination which limited eligibility for the *hostess* position to females. They, unlike the junior laid-off female flight pursers, could not make use of seniority they had acquired as flight pursers to stay on TWA's payroll as hostesses, even by "bumping" hostesses junior in over-all seniority to them. They had to accept furloughs without pay and wait for recall as flight pursers until their turn for recall came in accordance with their standing on the seniority list of furloughed flight pursers. The fact that there were approximately 3,500 hostess positions to some 300 flight purser positions gave the former hostesses a much better chance of continuing to work, though at a lower — hostess — salary, while their male furloughed counterparts were left without work.

In February, 1970 TWA created a new cabin service position, service manager, to supervise the flight attendant staff of the new jumbo jets. One year's service as a flight purser was made a prerequisite for the new position. The separate seniority lists for hostess and flight purser positions resulted in most of the new service manager positions going to male flight pursers. The complainant, Michel, applied for and was given a service manager position.

Later in 1970, and after collective bargaining, a new agreement was entered into between TWA and the Union, effective October 22, 1970. This agreement provided for procedures which would wipe out the last vestiges of the prior existing

pattern of sex discrimination in employment. *First*, males were made eligible for employment as hostesses and the title given in the new contract to all hostesses, male and female, was "cabin attendant" (art. 2, subd. [B]). *Second*, the seniority provisions of the contract were amended to provide that "seniority as a Cabin Attendant, Flight Purser or as a Service Manager shall be based upon length of service as a Cabin Attendant and/or as a Flight Purser with the Company" and that "a Cabin Attendant who successfully bids a Flight Purser vacancy shall be credited with his/her years of service as a Cabin Attendant for the purpose of vacation, rates of pay, sick leave and bidding provisions of this agreement" (art. 10, subd. [A]). The 1970 agreement also provided that "seniority shall govern all employees in case of furlough due to reduction in forces, re-employment after furlough, choice of vacancies, and preference of assignment to equipment" (art. 10, subd. [B]).

*Third*, the 1970 agreement also contained new provisions with respect to reductions in force (art. 12, subd. [B]), to wit: "When Cabin Attendants, Flight Pursers, or Service Managers are furloughed due to a reduction in force, the Cabin Attendant, Flight Purser, or Service Manager with the least system seniority in the job category reduced, at the domicile where the reduction occurs, shall be furloughed. A furloughed employee may bid on any vacancy in his/her classification on the system existing at the time of such reduction. If there are no vacancies at that time, the employee furloughed may displace the most junior employee in his or her classification on the system. If unable to displace within the classification, a Flight Purser may displace into the International Division as a Cabin Attendant. If the Flight Purser is unable to displace into the International Division, he or she may displace into the Domestic Division as a Cabin Attendant. * * * Flight Pursers who are reduced from the Purser category and who displace Cabin Attendants shall continue to accrue Purser seniority while thereafter serving as a Cabin Attendant. Any employee displacing into a lower category under this paragraph (B) will exercise his/her system seniority in such lower category for purposes of vacation, rates of pay, sick leave and bidding provisions of this Agreement."

The effect of these three changes in 1970 was to eliminate all limitations based on sex ineligibility for any of the three cabin attendant categories, as well as those adverse effects with respect to furloughs suffered and complained of by the pursers and by the hostesses who had become pursers after the 1967 agree-

ment stemming from the combination of the previously existing discriminations in employment eligibility based on sex and the denial of the right to carry over seniority from one category of cabin service position to another.

However, a concomitant effect of eliminating the previously existing tie between the accumulation of seniority and the specific job category in which the seniority was acquired and allowing seniority accumulated in one position to be carried over into another for purposes of furlough, re-employment after furlough, choice of vacancies, and preference of assignment of equipment and vacations, was that the much smaller number of male pursers found themselves competing for positions on the new seniority list with a much larger female hostess group. The result was that many of the male pursers found themselves moved to lower positions on the purser seniority list as additional hostesses qualified as pursers and took with them, for seniority ranking purposes, their accumulated periods of seniority as hostesses. It was this development, a loss of over 45 places on the seniority list resulting from the recasting of seniority computation in accordance with the 1970 agreement, that led to the complainant Michel's charge that TWA's compliance with the agreement, part of which reflected changes made necessary in order to conform to the requirements of the laws barring discrimination because of sex, constituted discrimination against him because of his sex.

### THE EFFECTS OF TWA'S EMPLOYMENT PRACTICES ON MICHEL.

Michel was originally employed by TWA in 1966 as a flight purser. In May of 1970, on the basis of his having more than a year of experience as a purser, he became a service manager on the 747 jumbo jet international flights of TWA. As a result of the changes wrought by the 1970 agreement between TWA and the Union, he found himself moving down on the seniority list by more than 45 numbers and facing the possibility of being eliminated entirely from the purser category because of the moving up of qualified hostesses with greater seniority than his to the position of purser.

### THE ORDERS OF THE DIVISION OF HUMAN RIGHTS AND THE STATE HUMAN RIGHTS APPEALS BOARD.

The division's order, after investigation, found no probable cause to believe that the respondents before the division (TWA and the Union) had engaged in any unlawful discriminatory

practice relating to employment *because of the complainant's sex.* It based this conclusion on its findings (1) that the record as a whole indicated that the hostesses were not accorded preferential treatment by the respondents and (2) that TWA's treatment of the complainant under company regulations and the union contract which set up certain procedures assuring priorities to those with seniority *regardless of sex* eliminated the possibility of discrimination because of sex. The division further noted that its decision was based on the Federal precedents " in the seniority field, and is in no way related to the sex of the complainant."

The State Human Rights Appeal Board found that " there appears to be a reasonable basis for Appellant's [Michel's] claim that although he was hired in 1966 he is faced with the prospect of being eliminated from the purser category entirely, and that his choice of flight patterns, overtime possibilities, vacation dates and such, is also seriously limited " (bracketed matter supplied). The appeal board reached its conclusion on the basis of the following findings: " It appears from the record that under the collective bargaining agreement former hostesses (designated therein as cabin attendants) became entitled to have their seniority, which had been accumulated as hostesses, carried over with respect to the positions of flight pursers or flight service managers. It also appears that there existed approximately 5,000 cabin attendant positions filled by women and about 300 purser positions filled by men and women. It further appears that up to about 1968 the cabin attendant positions could only be filled by women and the purser positions only by men. It would seem then, that if it became necessary to furlough flight pursers or flight service managers according to seniority, more male flight pursers or service managers than females would be required to go even though male pursers or service managers had actually served in such positions much longer than the female pursers or service managers."

### THE APPLICABLE LAW.

There is a fundamental flaw in the appeal board's reasoning. It ignores the fact that the complaint charged that the loss of seniority positions suffered by Michel was *discrimination because of sex,* a form of discrimination barred by the Human Rights Law since September 1, 1965 (L. 1965, ch. 516, § 1), yet its findings are that it was the change in carryover rights with respect to seniority, coupled with the fact that there were a much larger number of women cabin attendants than men that

brought about the effect complained of by Michel; that when furloughs of flight pursers or service managers became necessary, the use of cabin-service-wide seniority as the standard for selecting those furloughed would result in more male flight pursers or flight service managers being required to go "even though male pursers or service managers had actually served in such positions much longer than the female pursers or service managers."

Though this result may pragmatically offend one's sense of justice, it is not one that flows from considerations of sex preference but rather by reason of a change from a seniority system limited to that acquired in each specific job category to one which allows a person moving from one job category to a higher paid one within the same general employment area (here service of passengers in the flight cabin) to carry over his or her seniority which was accumulated in the lower paid job category. If the impact of this change bears more heavily upon male cabin employees, it results from the elimination of the prior discriminatory sex pattern of employment followed by TWA which involved (1) discrimination in favor of women in hiring of hostesses and (2) discrimination against women both in hiring of pursers and with respect to salary and supervisory responsibilities. Seniority systems may in some cases have a continuing discriminatory impact on a class of employees by serving as a barrier to transfer to higher paying jobs in other departments or, as here, in the period between 1967 and 1970, by denying to furloughed pursers the option of moving down to the lower paying hostess jobs to which their seniority as pursers, if transferable, might otherwise have entitled them.

*Where such continuing unlawful discriminatory effects occur and their maintenance freezes the status quo of prior discriminatory practices, they may be struck down under the Civil Rights Act of 1964* (U. S. Code, tit. 42, § 2000e-6, subd. [a]; *Robinson* v. *Lorillard Corp.*, 444 F. 2d 791, 795, 796; *United States* v. *Bethlehem Steel Corp.*, 446 F. 2d 652, 658; *United States* v. *Hayes Int. Corp.*, 456 F. 2d 112, 117, 118, 119). But here Michel's complaint stems from the change made in 1970, which (1) *eliminated* the discriminatory sex limitations on hostess positions and (2) altered the seniority system in a manner which eliminated any lingering effects of the previous pattern of sex discrimination. This previous pattern resulted in denial to male cabin attendants and service managers of an opportunity to use their seniority to bid for positions, when furloughed from their higher paying positions, to obtain the lower paying cabin

service jobs still available. Similarly, it allowed women, who had become pursers, to employ the total seniority they had acquired as cabin attendants (whether as hostesses, pursers or service managers) to obtain their proper standing in the seniority list for furlough and other working condition purposes.

There is nothing in the Human Rights Law that bars employers, in their collective bargaining with their employees as to terms and conditions of employment, from altering seniority patterns from position seniority to department-wide seniority, so long as the purpose and effect of such a change is not to preserve previously existing patterns of unlawful discrimination. As Senior Circuit Judge SOBELOFF put it in *Robinson* v. *Lorillard Corp.* (444 F. 2d 791, 800, *supra*) : "We recognize Lorillard's point that changing the seniority system may frustrate the expectations of employees who have established departmental seniority but not employment seniority in the preferable departments. However, Title VII guarantees that all employees are entitled to the *same* expectations regardless of ' race, color, religion, sex, or national origin.' Where some employees now have lower expectations than their coworkers because of the influence of one of these forbidden factors, they are entitled to have their expectations raised even if the expectations of others must be lowered in order to achieve the statutorily mandated equality of opportunity."

Here the major thrust of the complainant's argument is not that the change from position seniority to department seniority preserved, or was intended as, or caused, discrimination against him *because of sex* by TWA, but that the Union, by agreeing to the change in the seniority system, had failed to protect its male members from the adverse effects such a change might have on them, because there were many more female members with accumulated seniority in the flight cabin service department who would be able to advance on the seniority list over male cabin attendants if they qualified for and obtained employment as pursers or service managers.

The fact is that if the situation had been reversed and there had been a great turnover in the more numerous category of hostesses during the period prior to the adoption of the 1970 contract provisions as to department-wide seniority, there would have been fewer, if any, of the hostesses then employed who would have acquired substantial seniority in that position. Under such circumstances the effect of the change in seniority carryover rights might well have had an adverse effect on those in the hostess category (then all females) in cases of furlough

of all classes of cabin employees. If those in the purser position all had greater seniority than all the hostesses, the effect of such furloughs would have been felt solely by the hostesses, since their lesser seniority would cause only hostesses to be furloughed, because all furloughed pursers, male or female, would have been able to move down to hostess jobs by exercising their greater seniority to bid successfully for hostess positions.

The 1970 change in the seniority system in no way established sex as a criterion for employment benefits; on the contrary, it barred sex criteria as a basis for promotion or demotion. Neither did it involve actions or standards which offend against the statutory ban on discrimination based on sex. It would be ironic to hold, as did the appeal board, that the accident of a high percentage of women in the cabin service staff with substantial seniority credit and its concomitant impact on the seniority status of the pursers constituted discrimination based on sex.

### CONCLUSION.

Since we find no basis for the claim of discrimination *based on sex,* the order of the Human Rights Appeal Board should be annulled, on the law, and the order of the Division of Human Rights reinstated, without costs. This determination makes it unnecessary for us to resolve the second-step attack levied on the appeal board's order by the petitioner, to wit, that, in any case, the appeal board was in error when it reversed the division on the ground that its order of dismissal was arbitrary, capricious and an abuse of discretion because it exceeded the limited scope of review allowed it under section 297-a of the Executive Law. (See, however, in this connection, *Wyckoff Hgts. Hosp.* v. *State Div. of Human Rights,* 38 A D 2d 596; *Matter of Pepsi-Cola Metropolitan Bottling Co.* v. *State Human Rights Appeal Bd.,* 42 A D 2d 760.)

COHALAN, CHRIST, BRENNAN and MUNDER, JJ., concur.

Order of the Human Rights Appeal Board, dated February 27, 1974, annulled, on the law, and order of the State Division of Human Rights, dated June 22, 1973, reinstated, without costs.